### UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICAN EAGLE OUTFITTERS, INC., | **COMPLAINT** |
| *Plaintiff,* | Case No. _____ |
| v. | |
| VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, and MASTERCARD INTERNATIONAL INCORPORATED, | Electronically filed |
| *Defendants.* | **JURY TRIAL DEMANDED** |

Plaintiff American Eagle Outfitters, Inc., by its undersigned attorneys Gordon & Rees LLP, alleges, upon knowledge with respect to their own acts and upon information and belief as to all other matters, as follows:

## I.     INTRODUCTION

1.     American Eagle[1] is a clothing retailer offering high-quality, on-trend clothing and accessories and personal care products at affordable prices.  In the United States and Puerto Rico, American Eagle operates approximately 950 retail outlets and employs approximately 30,000 people.   Additionally, American Eagle has numerous stores and employees in international locations including, but not limited to, Canada, Mexico, Japan, Russia, Israel, Hong Kong, and China.

---

[1] Capitalized terms used herein are specifically defined in this Complaint in Section III, "Definitions."

2.      American Eagle brings this action against Visa and MasterCard (collectively "Defendants") for violations of federal and state antitrust laws resulting from Visa's and MasterCard's imposition upon American Eagle of millions of dollars in unlawful and excessive Interchange Fees associated with Credit and Debit Card (collectively "Payment Card") transactions which occurred during the period from January 1, 2004 through November 27, 2012 ("Damages Period"). [2]

3.      When the Damages Period began in 2004, Visa and MasterCard were the enterprises and/or instrumentalities that effectuated the conspiracies among each association's owner/Member Banks that had agreed to unreasonably, and illegally, restrain competition.  Prior to Visa's corporate restructuring in 2006 ("the Visa IPO") and MasterCard's in 2008 ( "the MasterCard IPO"), Visa and MasterCard were each organized as a membership corporation, the owners and members of which were virtually all of the competing banks and financial institutions that issue Payment Cards to consumers and/or that signed merchants to accept such cards.  Each membership was governed by executives selected from Visa's and MasterCard's Member Banks.  As the Second Circuit held, Visa and MasterCard were "not single entities; they [were] consortiums of competitors."  *See United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242

---

[2] The conduct complained of herein is ongoing and American Eagle would be seeking monetary and equitable relief for the continuing harm (occurring after the Damages Period) caused by the restraints of trade discussed throughout this Complaint if it was not barred from asserting such claims by the preliminary class settlement and related injunction in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720(JG)(JO) (E.D.N.Y.) ("MDL 1720").  As American Eagle and numerous other merchants have argued in formally objecting to this settlement, the injunction violates American Eagle's and all merchants' due process rights by improperly barring their individualized claims for ongoing and future damages, without giving them the right to completely opt out of the settlement and assert such claims.  Thus, even though American Eagle has opted out to the fullest extent permitted, its claims concerning Interchange Fees as set forth herein are limited to past damages, despite the fact that the conduct continues to harm competition and inflict damages on American Eagle and its customers.  As such, American Eagle reserves the right to amend is claims and does not waive any claims for additional monetary, equitable, and/or injunctive relief if the injunction is lifted or if otherwise permitted by law.

(2d Cir. 2003).

4.      Throughout the Damages Period, Visa and MasterCard were the enterprises and/or instrumentalities through which the Member Banks that issued Visa and MasterCard Payment Cards agreed not to compete with respect to merchant acceptance of those cards and fixed the Interchange Fees that merchants paid for acceptance of those cards.  These conspiracies began when Visa and MasterCard were structured as consortiums of competitors and continued unabated after the corporate reorganizations.  In fact, Visa and MasterCard and their Member Banks designed the restructurings to limit the appearance that Visa and MasterCard were controlled by their Member Banks and to mask the perpetuation of their anticompetitive cartels. For example, according to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard.   In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."  The banks sitting on Visa's and MasterCard's boards ratified these transactions on the anticompetitive conditions that all Member Banks continue to adhere to their agreements not to compete and that Visa and MasterCard maintain the default Interchange Fee rules that support the price fixing conspiracies.  Based on this continuation of the underlying conspiracies, nothing has changed since the IPOs and, if anything, Visa's and MasterCard's substantial market power has increased.

5.      As detailed herein, both Visa and MasterCard, along with their co-conspirator Member Banks, engaged and continue to engage in conspiracies in restraint of trade in the Credit

Card and Debit Card markets in the United States primarily by: (a) agreeing to collusively fix at supracompetitive levels the prices that merchants paid to accept their respective Payment Cards; and (b) implementing a scheme not to compete for merchant acceptance of their respective Payment Cards.  Additionally, Visa has monopolized the Debit Card market in the United States.

6.      These schemes and agreements to fix prices and not to compete have ensured that Visa and MasterCard, and their co-conspirator Member Banks, enjoyed, and continue to enjoy, supracompetitive profits.  The Member Banks have consistently declined to individually negotiate Payment Card acceptance with merchants, including American Eagle, even though it could or would have provided them with a competitive advantage to do so.  These supracompetitive profits also lured additional banks into joining the conspiracies, maintaining and enhancing the cartels' substantial market power.  Thus, their illegal competitive restraints have served both to bind Visa's and MasterCard's twin cartels with their owner and Member Banks, and to expand those cartels to achieve substantial market power in the Payment Card markets throughout the Damages Period.

7.      Visa's and MasterCard's  agreements with and among their Member Banks not to compete, and their price fixing schemes, are naked restraints of trade and *per se* violations of Section 1 of the Sherman Act.

8.      However, even if the Defendants' conduct is analyzed under the rule of reason, their conduct and the resulting massive anticompetitive harm constitute unreasonable restraints of trade in violation Section 1 of the Sherman Act.

9.      The Defendants' anticompetitive rules and practices are not reasonably necessary for the functioning of Payment Card Networks.  Interchange Fees are not necessary given the economics of issuing Payment Cards and any benefits that Defendants may claim are derived

from these restraints of trade can be achieved by means that are less destructive and harmful to competition.  Further, these restraints' anticompetitive effects, including massive overcharges to merchants and maintenance of substantial market power, outweigh any alleged benefit.

10.     The anticompetitive harm to merchants and consumers from the Defendants' price fixing and other anticompetitive conduct has been enormous.  During the Damages Period, Defendants imposed Interchange Fees estimated at more than $350 billion on merchants in the United States, including more than $100 million on American Eagle.     Defendants' anticompetitive conduct also has limited competition in the Payment Card markets, depriving participants in these markets of lower prices, innovation, new payment options, and cost-saving approaches that would have substantially benefited U.S. merchants and consumers.

## II.     <u>JURISDICTION AND VENUE</u>

11.     This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).  The Court has jurisdiction over state antitrust and unfair competition law claims alleged herein under 28 U.S.C. § 1367.

12.     Defendants transact business throughout the United States, including in this District, have had substantial contacts with the United States, including this District, and/or were engaged in an illegal and anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, and/or doing business throughout the United States, including in this District.  The interstate trade and commerce involved and affected by the alleged violations of antitrust law occurred, in part, in this District.  The acts complained of have

had, and will have, substantial anticompetitive effects in the District.  Venue is proper in this

District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

## III.    DEFINITIONS

13.    The following terms are used in this Complaint:

### Relevant Parties and Entities

a.    "American Eagle" and "Plaintiff" means American Eagle Outfitters, Inc. and its subsidiaries and affiliates in existence now and throughout the Damages Period.

b.    "Visa" means Visa U.S.A., Visa International, and Visa Inc. collectively.

c.    "Visa IPO" means the corporate restructurings of Visa generally described in Sections I. and IV.B.1. of this Complaint.

d.    "MasterCard" means MasterCard Incorporated and MasterCard International Incorporated (and MasterCard Worldwide) collectively.

e.    "MasterCard IPO" means the corporate restructurings of MasterCard generally described in Sections I. and IV.B.2. of this Complaint.

f.    "Defendants" means Visa and MasterCard collectively.

### Payment Cards

g.    "Payment Card" means a Credit Card or a Debit Card.

#### Credit Cards

h.    "Credit Card" during the Damages Period means a plastic or similar payment card or other physical form, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Credit Cards include Premium Credit Cards and Charge Cards, but not private label or proprietary Payment Cards that can typically be used at only a single merchant.

i.    "Premium Credit Card" means a Credit Card that carries a higher Interchange Fee than standard Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder.  The "Visa Signature Preferred Card" product and "World MasterCard Card" product are examples of Premium Credit Cards.

j.    "Charge Card" (also referred to as a "Travel and Entertainment Card" or "T&E card") is a Payment Card for which the cardholder is required, under most circumstances, to pay the card balance in full each month.  Diners Club cards and traditional American Express Green, Gold, Platinum and Centurion (Black) cards without preset spending

limits are examples of Charge Cards.

k.     "<u>Payment Card Network</u>" and "Network" means an electronic payment system used to accept, transmit or process transactions made by Payment Cards for money, goods or services and to transfer information and funds among Issuers, Acquirers, merchants and users of Payment Cards.  Both Visa and MasterCard operate Payment Card Networks.

l.     "<u>Credit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using Credit Cards are conducted, including authorization, clearance, and settlement.

### *Debit Cards*

m.     "<u>Debit Card</u>" during the Damages Period means a plastic or similar payment card or other physical form, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account at a bank or other financial institution.  Visa's Signature Debit Card program (the "Visa Check Card") and MasterCard's Signature Debit Card program (sometimes referred to as "Debit MasterCard") are Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and MasterCard's Maestro networks.  Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's demand deposit account.  Examples include, but are not limited to, payroll cards, cards associated with a flexible spending account, health reimbursement arrangement, or health savings account.

n.     "<u>PIN Debit Card</u>" means a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point-of-sale and entering a personal identification number ("PIN").  PIN Debit Card networks grew out of regional ATM networks and are processed differently than Signature Debit Card transactions.  Examples of PIN Debit Card networks include Visa's Interlink network, MasterCard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

o.     "<u>Signature Debit Card</u>" means a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as Credit Card transactions.  Examples of Signature Debit Cards include the Visa Check Card product and the Debit MasterCard product.

p.     "<u>Debit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using Debit Cards are conducted, including authorization, clearance, and settlement.

**The Credit and Debit Card Transaction**

q. "Issuer" means a bank or other financial institution that issues Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations. Issuers authorized by the Visa and MasterCard Payment Card Networks to issue Visa- and/or MasterCard-branded Payment Cards are members of those networks.

r. "Acquirer" means a bank or other financial institution that has been authorized by a Payment Card Network to enter into agreements with merchants that enable those merchants to accept Payment Cards for the purchase of goods and services. Acquirers authorized by the Visa and MasterCard Payment Card Networks to acquire Visa- and/or MasterCard-branded card transactions are members and/or agents of those networks.

s. "Member Bank" or "Member Banks" refer to those banks, financial institutions and entities that are members of either or both of the Visa and/or MasterCard Payment Card Networks. Several Member Banks are and have been throughout the Damages Period both Issuers and Acquirers. The Member Banks that are Issuers are actual or potential competitors for the issuance of Payment Cards. The Member Banks that are Acquirers are actual or potential competitors for acquisition of merchants. The great majority of Member Banks are members of both the Visa and Mastercard Payment Card Networks.

t. "Interchange Fees" are fees or rates fixed by Visa or MasterCard and their Member Banks that are paid to Issuers by merchants in conjunction with transactions in which Visa or MasterCard Payment Cards are used as a means of payment for purchases of goods and services. Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa or MasterCard Payment Card transaction.

u. "Honor All Issuers" rules are the "Honor All Cards" rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded Credit Cards to accept all such Credit Cards that carry the brand of that network, and the rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded Debit Cards to accept all such Debit Cards that carry the brand of the respective Network.

## IV. PARTIES

### A. Plaintiff

14. American Eagle Outfitters, Inc. is a corporation created and existing under the laws of Delaware, with its principal place of business in Pittsburgh, Pennsylvania. American Eagle Outfitters, Inc. brings this action on its own behalf and on behalf of its subsidiaries and

affiliates and is seeking to recover damages incurred by American Eagle Outfitters, Inc. and its

subsidiaries and affiliates, including those identified in paragraph 16 below.

15.     During the Damages Period, American Eagle marketed its products under four

primary brands - American Eagle Outfitters, aerie, MARTIN + OSA, and 77kids - each aimed at

a different group of consumers.  However, American Eagle no longer markets products under the

MARTIN + OSA, and 77kids brands.

16.     During the Damages Period, American Eagle's retail stores in the United States

and Puerto Rico were operated by American Eagle Outfitters, Inc. through its wholly owned

subsidiaries as follows:  M+O Retail Co. and, subsequently, M+O Retail LLC[3] (all

MARTIN+OSA brand stores); Retail Royalty Company (NV stores); AEO Management Co.

(Puerto Rican stores); AE Retail West LLC (AZ, CA, HI, KS, ME, MN, ND, NE, NH, OR, SD,

UT, WY); AE Outfitters Retail Co. (stores in all other states); and AE Direct Co. (internet sales).

17.     Throughout the Damages Period, American Eagle accepted Visa and MasterCard

Payment Cards both at its retail stores and for internet sales.  American Eagle has timely opted

out of MDL 1720.

**B.      Defendants**

**1.      Visa**

18.     Prior to the Visa IPO, Defendant Visa International Service Association ("Visa

International") operated as a nonstock Delaware corporation with its principal place of business

in Foster City, California.  Its owners/members included approximately 21,000 Member Banks.

19.     Prior to the Visa IPO, Defendant Visa U.S.A. Inc. ("Visa U.S.A.") operated as a

nonstock Delaware corporation with its principal place of business in Foster City, California.  Its

---

[3] M+O Retail Co. was merged into M+O Retail LLC in 2008 and M+O Retail LLC was merged into AE
Outfitters Retail Co. in 2012.

owners/members included approximately 14,000 Member Banks.

20.     Prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors (and Visa International had regional boards of directors for each of its geographical regions) comprised of executives selected from their Member Banks.  Visa U.S.A. also was a regional group member of Visa International.

21.     Visa U.S.A. and Visa International, as well as other Visa entities not named as defendants in this Complaint, conducted a number of restructurings in 2007 and 2008 to combine several previously independent corporate entities into Defendant Visa Inc.

22.     On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its Member Banks.

23.     As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in San Francisco, California.  Also, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa Inc. and continue to operate as such today.

24.     Visa operates Payment Card Networks and did so throughout the Damages Period.

**2.     MasterCard**

25.     Prior to the MasterCard IPO, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant MasterCard International Incorporated, a wholly owned subsidiary of MasterCard Incorporated with its principal place of business in Purchase, New York, was a Delaware membership corporation that, prior to the MasterCard IPO, consisted

of more than 23,000 owners/Member Banks worldwide and was the principal operating subsidiary of MasterCard Incorporated.

26.     Prior to the MasterCard IPO, MasterCard Incorporated and MasterCard International Incorporated were governed by a global board of directors, as well as regional boards of directors for each of their geographic regions, that were comprised of executives selected from their Member Banks.

27.     On May 25, 2006, MasterCard Incorporated and MasterCard International Incorporated conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to MasterCard's Member Banks.

28.     As a result, MasterCard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, MasterCard International Incorporated has remained MasterCard Incorporated's principal operating subsidiary with its principal place of business in Purchase, New York, and doing business as MasterCard Worldwide.

29.     MasterCard operates Payment Card Networks and did so throughout the Damages Period.

## V.      **FACTUAL ALLEGATIONS**

### A.      **Relevant Product Markets**

30.     Merchants' demand for Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a Payment Card) is derived from consumer demand for using Payment Cards to pay for goods and services. Accordingly, because consumer demand establishes both a distinct Credit Card market as well as

a Debit Card market, there are corresponding markets, based upon derived merchant demand, for Credit Card Network Services and Debit Card Network Services.

31.     Credit and Debit Cards are not reasonably interchangeable with each other or with other forms of tender.

**1.      There Are Distinct Markets for Credit Card Network Services and Debit Card Network Services.**

**a.      Credit Card Network Services**

32.     There were relevant product markets for Credit Cards and Credit Card Network Services throughout the Damages Period.  The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry, and by public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint.  These markets continue to be relevant product markets today.

33.     Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer.  These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time. Charge Cards are a subset of Credit Cards that require the consumer to pay off the balance owed upon receipt of their statement, usually monthly.

34.     From the consumer perspective, there are no close substitutes for Credit Cards because other forms of payment do not offer comparable credit facilities.  Thus, for large purchases that a consumer needs to finance over time, Credit Cards are better than are other payment methods such as cash, checks, and Debit Cards, which do not allow deferred payment. This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for Credit Card transactions consistently has significantly exceeded the average ticket for Debit Card transactions since the mid-1990s.

35.     In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 336 (S.D.N.Y. 2001), *aff'd*, 433 F. 3d 229 (2d Cir. 2003), the court held that "consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards."  The court also found that Issuers "do not view cash or checks as 'competitive' with general purpose [credit] cards."  *Id.*  Most consumers do not want to carry large sums of cash to make large purchases, and checks do not match the acceptance of Credit Cards.

36.     Thus, Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions and for which other payment methods are not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for Credit Cards.  This was the case throughout the Damages Period.

37.     As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such [hypothetical] price increase unprofitable for a hypothetical monopolist of general purpose [credit] card products."

38.     Limited purpose proprietary credit cards, such as the Sears' card, generally were (and are) accepted only by a single merchant.  Consumers, as a result, did not (and do not) consider proprietary credit cards to be reasonably interchangeable with Credit Cards that can be used at numerous merchant locations, as recognized by the court in *United States v. Visa U.S.A. Inc.*  That court held that "[b]ecause proprietary cards, such as a Sears or Macy's card, are accepted only at a single merchant[,] consumers do not believe that proprietary cards are substitutes for general purpose [Credit and Charge Cards] and therefore they should not be included in the relevant market."  163 F. Supp. 2d. at 336.  Because of their limited utility,

proprietary cards did not (and do not) constrain the prices to merchants for accepting Credit Cards.

39.     The events following the settlement of the *Visa Check* class action (*In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.)) challenging the credit/debit tying rules, discussed further in sections V.E. and V.F. below, also support the conclusion that Credit Cards and Debit Cards are in separate markets.  The settlements required Visa and MasterCard to untie Credit Card and Debit Card acceptance and give merchants the right to choose to accept one product without the other.  Once the settlements went into effect on January 1, 2004 and the tie between credit and debit acceptance was broken, Visa and MasterCard increased Credit Card Interchange Fees and reduced Signature Debit Card Interchange Fees.  This outcome demonstrates that Credit Cards and Debit Cards are in separate markets.

40.     Interchange Fees for both PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated regulations pursuant to the Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"), but Credit Card Interchange Fees have not decreased in response to reduced Debit Card fees to merchants.  The absence of sensitivity of Credit Card Interchange Fees to Debit Card Interchange Fees is strong economic evidence that Credit Cards and Debit Cards are not in the same relevant market.

41.     During the Damages Period, Visa and MasterCard have continued to raise Credit Card Interchange Fees, including significant rate increases for Premium Credit Card transaction, and no merchants have stopped accepting Visa and MasterCard Credit Card transactions.  This shows that merchants continue to believe that a sufficient number of consumers view Credit

Cards as unique and that merchants must accept them.

42.     Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

### b.     Debit Card Network Services

43.     There were relevant product markets for Debit Cards and Debit Card Network Services throughout the Damages Period.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry, and by public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint.  These markets continue to be relevant product markets today.

44.     Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a demand deposit or checking account.  Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.  Depending on the type of debit transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days later.

45.     Both PIN and Signature Debit Cards offer basically the same functionality to consumers in providing a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this.

46.     Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's demand deposit account, Debit Cards are strongly differentiated from Credit Cards.  Consumers do not consider Credit Cards to be an adequate substitute for Debit Cards.  Consumers tend to use Debit Cards for everyday purchases, such as groceries, small household items, and other small value purchases, especially of non-durable goods.  Many consumers segment their purchases and prefer to put these everyday purchases on their Debit Cards and use their Credit Cards for larger ticket items that are not consumed on a monthly basis.

47.     In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 337, the court held that:

> Consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards.   Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a PIN number, are not adequate [substitutes for general purpose credit cards].  Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. . . .   Knowledgeable industry executives agree with these conclusions.

48.     Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases).  As Visa and MasterCard have acknowledged, Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option.  Consumers view Debit Cards as superior to cash and checks.  Thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase.  Cash and checks also are not reasonably interchangeable with Debit Card Network Services for merchants.  As the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero ("at par") to

supracompetitive levels, merchants did not substitute away from debit.

49.     Merchant demand exists separately for Credit Card Network Services and Debit Card Network Services.  As noted by the court in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003), "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct from merchant demand for debit card network services."  "[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole."  *Visa Check*, 2003 WL 1712568, at *7.

50.     Debit Cards are regulated separately and differently from Credit Cards as the maximum level of Interchange Fees set by the Durbin Amendment does not apply to Credit Cards.

**B.     The Geographic Market for All Relevant Product Markets is the United States.**

51.     Throughout the Damages Period and continuing to today, the geographic market for all relevant product markets has been the United States, including its territories.  Many of Visa's and MasterCard's rules regarding Credit Card and Debit Card transactions applied only to the U.S. market.  Visa and MasterCard also set policies and pricing, including Interchange Fees, separately for the United States from other regions.  Additionally, U.S. consumers would not find Credit Cards or Debit Cards issued in other countries, and therefore other currencies, to be adequate substitutes for Credit Cards or Debit Cards issued by U.S. banks.  Defendants also have demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants to turn to other services sufficiently to make these price increases unprofitable.

C.      **The Co-Conspirator Member Banks and Their Relationships with Visa and Mastercard**

52.     Certain Member Banks were board members of Visa from the beginning of the Damages Period through Visa's IPO in 2008 (and some were board members after as well.)  As Visa board members and/or as Visa owners, such Member Banks collectively controlled every aspect of Visa's business.  This collective control included their agreements:  (1) not to compete with one another for merchants' acceptance of Visa Payment Cards; (2) to fix the Interchange Fees for Visa Payment Card transactions in furtherance of their agreement not to compete; and (3) to set Visa's rules, including all such rules discussed in this Complaint.

53.     Additionally, with control over pre-IPO Visa, the Member Banks explicitly agreed to proceed with Visa's IPO on the condition that Visa's post-IPO structure would enable substantive continuation of the agreement not to complete and attendant price fixing detailed in this Complaint.

54.     All Visa Member Banks effectively delegated to Visa, in perpetuity, the ability to fix the banks' Interchange Fees to merchants and knew that their fellow Visa Member Banks were also delegating their pricing decisions to Visa, which arrangement was further ratified by an agreement of Visa's Member Banks when they voted to approve Visa's restructuring.  Each Visa Member Bank knew that Visa would continue to enforce its default Interchange Fee and Honor All Issuers rules.

55.     Certain Member Banks were board members of MasterCard from the beginning of the Damages Period through MasterCard's IPO in 2006 (and some were board members after as well.)  As MasterCard board members and/or as MasterCard owners and Member Banks, such Member Banks collectively controlled every aspect of MasterCard's business.  This collective control included their agreement:  (1) not to compete with one another for merchants' acceptance

of MasterCard Payment Cards; (2) to fix the Interchange Fees for MasterCard Payment Card transactions in furtherance of their agreement not to compete; and (3) to set MasterCard's rules, including all such rules discussed in this Complaint.

56.     Additionally, with control over MasterCard before the IPO, the Member Banks explicitly agreed to proceed with MasterCard's IPO on the condition that MasterCard's post-IPO structure would enable substantive continuation of the agreement not to complete and price fixing detailed in this Complaint.

57.     All MasterCard Member Banks effectively delegated to MasterCard, in perpetuity, the ability to fix the banks' Interchange Fees to merchants and knew that their fellow MasterCard Member Banks were also delegating their pricing decisions to MasterCard, which arrangement was further ratified by an agreement of MasterCard's Member Banks when they voted to approve MasterCard's restructuring.  Each MasterCard Member Bank knew that MasterCard would continue to enforce its default Interchange Fee and Honor All Issuers rules.

58.     The Member Banks have conspired and continue to conspire with each other and with Visa and MasterCard not to compete with one another for merchants' acceptance of Payment Cards, to require the payment of an Interchange Fee on every Visa and MasterCard transaction, to fix the level of Interchange Fees that they charge to merchants, and engage in other anticompetitive conduct detailed in this Complaint.

59.     After the IPOs, neither Visa nor MasterCard, nor any of the Member Banks, took any affirmative action to withdraw from the respective combinations.

60.     Indeed, after the IPOs, as before, Visa and MasterCard have served as managers, facilitators and coordinators of horizontal agreements among their Member Banks and have been the enterprises and instrumentalities by which Member Banks conspired for the anticompetitive

purposes set forth in this Complaint, which have eliminated and continue to eliminate competition for merchant acceptance among Issuers.

61.     It would be contrary to the independent self-interest of any Issuer to adhere to the anti-competitive restraints detailed herein without the agreement of the remaining Issuers also to impose and adhere to those restraints and, but for the arrangements facilitated by Visa and MasterCard, the Issuers would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

62.     In other aspects of their businesses, the Member Banks compete against one another.  For example, Member Banks that are Issuers compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their payment cards more attractive than those offered by other issuing banks.  As found in *United States v. Visa U.S.A., Inc.*, cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protection programs."  163 F. Supp. 2d at 334.  These facts continue to be true today.  Certain Member Banks also compete to serve as Acquirers in merchant transactions.

63.     However, the Member Banks do not compete for merchant acceptance of the cards they issue.  Instead, both before and after the Visa and MasterCard IPOs, the Member Banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue.

64.     As discussed further below, by continuing to agree to and adhere to the anticompetitive restraints detailed in this Complaint, Visa, MasterCard and the Member Banks

have deprived the marketplace of independent centers of decision-making and, therefore, of actual and/or potential competition.  Based on this continuation of the underlying conspiracy, nothing has changed since the IPOs and, if anything, Visa's and MasterCard's substantial market power has grown.

**D.      Defendants' Anticompetitive Cartels**

65.      Defendants, with their Member Banks, created and maintained two separate cartels that implemented their agreements to fix prices and not to compete.  One conspiracy was perpetrated by Visa and its Member Banks, and another was perpetrated by MasterCard and its Member Banks.

66.      The foundations of each of these conspiracies are Visa's and MasterCard's Honor All Issuers rules.  Pursuant to these rules, each network's Member Banks have agreed that any merchant that accepts any one bank's Credit or Debit Cards issued over that Payment Card Network must accept all other banks' Credit or Debit Cards that carry the brand of that Network. These "all or nothing" rules constitute agreements among the Member Banks not to compete for merchants' acceptance of their Credit Cards and Debit Cards.

67.      To reinforce their agreements not to compete for merchant acceptance, each Network's Issuers have colluded to fix the Interchange Fees they charge merchants on every transaction through default Interchange Fee rules (discussed in greater detail below.)  This has prevented merchants from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market.

68.      Instead, merchants, including American Eagle, accepting either Visa or MasterCard Payment Cards pay the same Interchange Fee on a given transaction regardless of which Issuer is involved.  There is no competition.

69.      Within each conspiracy, the Issuers charge merchants exactly the same inflated

Interchange Fee prices that are the products of the Member Banks' collusion. These Member Banks typically compete vigorously for cardholders, but they do not compete for merchant acceptance or for the Interchange Fees that American Eagle and other merchants pay to accept their Visa and MasterCard cards.

70.     Visa and MasterCard are the enterprises by which otherwise competing Member Banks implement and effectuate their agreements <u>not</u> to compete and to fix prices. These schemes have relied on rules, such as the Honor All Issuers rules, default Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes (discussed further below), which have bound Visa and MasterCard Issuers and Acquirers.

71.     In addition to inflicting direct anticompetitive harm on merchants with these price fixing conspiracies, Defendants also used them to acquire and maintain their substantial market power. Specifically, Visa and MasterCard used these supracompetitive Interchange Fees as an incentive for Issuers (who ultimately receive the Interchange Fees paid by merchants) to issue Visa and MasterCard Payment Cards. Using price fixing to induce Issuers to join their cartels, Visa and MasterCard acquired sufficient market power in the Payment Card markets such that most merchants were compelled to accept their cards for payment. Moreover, once a merchant, such as American Eagle, started accepting Visa's and MasterCard's Payment Cards for payment, it was impossible to stop accepting them.

72.     Once Visa and MasterCard acquired substantial market power over merchants, they maintained it by forcing merchants to pay ever higher Interchange Fees to continue to fund these price fixing schemes and thereby perpetually maintain and enhance their cartels' market power.

73.     Although Visa and MasterCard initially focused their anticompetitive conduct on Credit Cards, once they achieved substantial market power in the Credit Card market they leveraged it to gain substantial market power in the Debit Card market by forcing merchants to accept Signature Debit Card transactions as a condition of accepting their dominant Credit Card transactions and by engaging in a variety of other exclusionary conduct.

74.     As the natural and intended consequences of their anticompetitive conduct, Defendants and the Member Banks set both Credit Card and Debit Card Interchange Fees at supracompetitive levels.  Such anticompetitive conduct generated more than $350 billion in Interchange Fees for the colluding Issuers during the Damages Period.  Merchants, including American Eagle, paid these anticompetitive fees direction throughout the Damages Period to the present day.

75.     Defendants' anticompetitive conduct during the Damages Period was not reasonably necessary to operate the Payment Card Networks.  As discussed below, domestic and international examples have demonstrated that Interchange Fees are economically unnecessary to encourage Issuers to issue Payment Cards or for these payment systems to function.  Thus, Defendants' and the Member Banks' collusively fixed and supracompetitive Interchange Fees were and are unjustifiable.

**1.     During the Damages Period, Visa and MasterCard facilitated horizontal conspiracies of their Member Banks.**

76.     As owners of Visa and MasterCard, and as board members and participants in key operating committees of Visa and MasterCard prior to Visa's and MasterCard's respective IPOs, the Visa and MasterCard Member Banks conspired to control every aspect of Visa's and MasterCard's business.  Such collective control was used to implement the Member Banks' agreements not to compete for merchant acceptance of Payment Cards, and the associated

agreements to fix Interchange Fees for Visa and MasterCard Payment Card transactions.  During

the Damages Period, the Visa and MasterCard Member Banks ratified the default Interchange

Fee schedules recommended by staff and consultants of Visa and MasterCard.  Also during that

time, the conspiracies grew as more banks joined Visa and MasterCard and agreed to abide by

the agreements to fix prices and not to compete, and as banks added new high Interchange Fee

products to the universe of Visa and MasterCard products, such as Premium Credit Cards.

      77.     In a decision affirming the condemnation of other exclusionary Visa and

MasterCard rules, the Second Circuit held in 2003 that Visa and MasterCard:

> are not single entities; they are consortiums of competitors.  They are owned and
> effectively operated by some 20,000 banks, which compete with one another in
> the issuance of payment cards and the acquiring of merchants' transactions.
> These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These
> competitors have agreed to abide by a restrictive exclusivity provision. . . . <u>The
> restrictive provision is a horizontal restraint adopted by 20,000 competitors</u>.

*United States v. Visa U.S.A. Inc.*, 344 F.3d at 242 (emphasis added).  Like those restrictive

provisions, to which certain Member Banks agreed in their capacities as board members and/or

owners of Visa and MasterCard, the anticompetitive conduct by Visa and MasterCard

establishing the agreements not to compete and price-fixing schemes were the products of

conspiracies among competing Issuers that continue to this day.

      **2.**     **The Honor All Issuers rules constituted unjustifiable horizontal agreements
not to compete on price.**

      78.     In order to eliminate any incentive for Issuers to compete for merchant acceptance

based upon Interchange Fees, as they would have done  in a competitive market, the Member

Banks represented on Visa's and MasterCard's governing boards of directors approved the

Honor All Issuers rules.  *See, e.g.,* MasterCard Rule 5.6.1, *MasterCard Rules* (Oct. 2008); Visa

Rule 5.2B, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008).

The rules require a merchant to accept all of a network's Issuers' Credit (or all Debit) Cards bearing the network's brand if that merchant wants to accept any single Issuer's Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.  These rules also prohibit merchants from steering consumers from using one Issuer's Visa or MasterCard Payment Cards to using Payment Cards issued by other Issuers or other cheaper forms of payment.

79.     Through these "all or nothing" rules, merchants like American Eagle were and are forced to accept all Credit (or Debit) Cards bearing the Network's brand and simultaneously forbidden from steering consumers to less or the least expensive forms of payment, even to another Issuer or Payment Card within or bearing the Network's brand.  Consequently, Issuers need not worry about losing business to a lower-cost competitor because all Payment Cards issued by every Issuer will be accepted at the default Interchange Fee rates.  Because of these rules, Issuers have no incentive to enter into bilateral agreements outside of the conspiracy and price-fixing scheme, no incentive to offer any reduction to Interchange Fees, and no incentive to compete on price.  Thus, as a result of this conspiracy, the default Interchange Fees have become a non-negotiable price floor because it makes no economic sense for any Issuer to compete on price.

80.     Without the Honor All Issuers rules, an individual, profit-maximizing Issuer's economic interest would require it to lower the price it charged in order to compete for merchants' business against other Issuers of similar Payment Cards.  In fact, because of these rules and this conspiracy, Acquirers and Issuers have rebuffed overtures from American Eagle and other merchants to negotiate Interchange Fees and enter into mutually beneficial arrangements.

81.     Although Visa and MasterCard have argued that the Honor All Issuers rules are

necessary to ensure universal acceptance of their Payment Cards and for their networks to function, their conduct demonstrates the pretextual nature of this position.  During the Damages Period, Visa and MasterCard permitted and have not been harmed by the introduction and use of products that function at only a subset of locations accepting Visa and MasterCard Payment Cards generally (such as selective-acceptance or selective-authorization cards, including, for example, flexible spending and health reimbursement account cards bearing network logos despite not having universal acceptance at Visa and MasterCard locations.)  After the Damages Period, Visa and Chase Bank USA, N.A (and/or one or more if its affiliates, subsidiaries, predecessors or related companies)(collectively "Chase") entered into an arrangement that purports to provide merchants with the ability to prefer Chase-issued Visa Payment Cards over other Visa Payment Cards in certain circumstances.  Despite these facts, among others, the Payment Networks have continued to function.  Further, Visa's and MasterCard's objectives could be realized through less restrictive means.

> **3.    The default Interchange Fee rules are unlawful horizontal agreements on price.**

82.    The default Interchange Fee rules are the mechanisms that Defendants and their Member Banks use to fix Interchange Fee prices.  Both Visa and MasterCard require that a default Interchange Fee apply to every transaction for which the Issuer and Acquirer have not entered a separate, individually-negotiated agreement regarding fees ("bilateral agreement").  *See, e.g.,* MasterCard Rule 9.4, *MasterCard Rules* (Oct. 2008); Visa Rule 9.5, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008).  These rules underpinned the Interchange Fee schedules, which applied to Visa and MasterCard transactions throughout the Damages Period.

83.    While competition would have motivated rival Issuers to charge lower fees than

the default Interchange Fees, they have never done so because the Honor All Issuers rules, working in tandem with the default Interchange Fee rules, eliminated any incentive for Issuers to charge fees below the anticompetitively-high levels being fixed by the above conspiracies.  As a result, there have been no bilateral agreements entered into by Member Banks of Visa or MasterCard.

84.     In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and MasterCard monitored transaction to ensure application of the appropriate Interchange Fee.  At the same time, Visa's and MasterCard's rules required all Issuers and Acquirers to adhere to all network rules.  *See, e.g.,* MasterCard Rule 1.5.5, *MasterCard Rules* (Oct. 2008); Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008).  Member Banks violating any of these network rules were subject to fines and even expulsion from Visa and MasterCard, and the networks could not be held liable by such banks.  *See, e.g.,* MasterCard Rules 3.1, 3.1.2, 3.3, *MasterCard Rules* (Oct. 2008); Visa Rule 1.7, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008); Visa Core Principles 1, 2.3, *Visa Internal Operating Regulations* (Oct. 15, 2010).  This has enabled Visa and MasterCard to monitor compliance with and enforce the rules of their respective cartels.

85.     All Issuers used the same default Interchange Fee schedules for any given Visa and MasterCard payment transaction but, within each of those schedules, there was wide variability in the fees charged for various transactions.  For example, a schedule of default Interchange Fees set different fee levels for different card types (e.g., standard Credit Cards versus Premium Credit Cards).  This schedule of default Interchange Fees also imposed different fee levels by merchant category, with card-not-present merchants (for example, those that sell by

Internet, phone, or mail order) paying substantially higher rates and with supermarkets and warehouse clubs paying comparatively low rates.  This price discrimination evidenced Visa's and MasterCard's substantial market power.  While there were different fees within a given default Interchange Fee schedule, every Issuer applied the same fee schedule to a given transaction.  It is this collusion by every Issuer to set identical default Interchange Fee schedules that constitutes price fixing.

**4.    American Eagle pays Interchange Fees directly.**

86.    When American Eagle accepts a Visa or MasterCard Payment Card as payment for a transaction, American Eagle is the direct purchaser of Payment Card Network Services and directly pays the Interchange Fees associated with that transaction.

87.    When a Payment Card transaction occurs, the Issuer directly deducts the Interchange Fee from the transaction amount due to American Eagle before transmitting funds due on the transaction.

88.    Thus, American Eagle, not the Acquirer, directly pays the Interchange Fees. Accordingly, American Eagle accounts for Interchange Fees as an expense and the Issuers account for Interchange Fees as revenue.

89.    On the other hand, Acquirers do not receive, pay, or otherwise transmit Interchange Fees.  Accordingly, Acquirers do not account for Interchange Fees as an expense.

90.    In contrast to Interchange Fees, Acquirers do pay certain Network assessments. Such assessments are charged to the Acquirers, typically as part of a monthly invoice, and are paid directly by them, just like any other cost of doing business (e.g., electricity bills).

91.    Unlike Interchange Fees, which the Acquirers do not pay directly and do not treat as expenses, the Acquirers directly pay these Network assessments and treat them as expenses.

**5.    Defendants have used their price fixing schemes to establish, maintain, and enhance their long-held market power.**

92.    As courts have repeatedly determined, Visa and MasterCard acquired substantial market power in the Payment Card markets using price fixing to induce Issuers to join the price fixing cartels.  For example, in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-342, the court found that Visa had market power in the market for Credit Card Network Services with a 47% share of the dollar volume of Credit Card transactions in the United States and that MasterCard's 26% share of dollar volume of Credit Card transactions was sufficient to demonstrate that it had market power in the market, and further determined that "[b]ecause Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers." There, the United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." *Id.*

93.    The Second Circuit affirmed this determination of market power, holding that "Visa, U.S.A. and MasterCard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc.*, 344 F.3d at 239.

94.    In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court confirmed the existence of barriers to entering the relevant product markets, reaffirmed that Visa had market power in the Credit Card market based on a finding that its market share fluctuated between 43% and 47%, and found that

MasterCard's 26% to 28% market share was sufficiently high to go to a jury on the question of MasterCard's market power. Visa's and MasterCard's shares of the Credit Card market have not changed significantly since these two holdings.

95. The Debit Card market is dominated by Visa and MasterCard. At the outset of the Damages Period, combined, Visa and MasterCard comprised approximately 75% of all Debit Card purchase volume. Today, they comprise over 80% of that volume.

96. Visa's and MasterCard's substantial market power is evidenced and protected by high barriers to entry. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d at 341 (finding that there are high barriers to entry into the Credit Card market.)

97. To be a viable payment network competitor, a potential entrant would need both: (1) widespread, if not ubiquitous, merchant acceptance; and (2) large-scale distribution to consumers through Issuers. While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear both barriers simultaneously.

98. Merchants are generally unwilling to accept a Payment Card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a Payment Card brand that is not widely accepted by merchants. Therefore, starting a new network, whether Debit or Credit Card, with sufficient scale to challenge Visa or MasterCard is extremely difficult. These high barriers to entry, coupled with the entrenched dominance of Visa and MasterCard, explain in large part why no meaningful entry has occurred in the Credit Card and Debit Card markets since Discover entered nearly three decades ago in 1985. Discover has never achieved more than a 7% share of the Credit Card market and its current share is approximately 5%.

99. The Antitrust Division recently highlighted this structural barrier to entry in the context of the Credit Card market in its Competitive Impact Statement relating to the Proposed

Final Judgment as to Visa and MasterCard in *United States v. American Express Co.*, No. 10-cv-

4496-NGG-RER, Dkt. #5, at 7 (E.D.N.Y. Oct. 4, 2010):

> Significant barriers to entry and expansion protect Defendants' market power, and
> have contributed to Defendants' ability to maintain high prices for years without
> threat of price competition by new entry or expansion in the market.  Barriers to
> entry and expansion include the prohibitive cost of establishing a physical
> network over which Card transactions can run, developing a widely recognized
> brand, and establishing a base of merchants and a base of cardholders.
> Defendants, which achieved these necessities early in the history of the industry,
> hold substantial early-mover advantages over prospective subsequent entrants.
> Successful entry today would be difficult, time consuming, and expensive.

100.    Visa's and MasterCard's substantial market power has persisted throughout the

Damages Period and remains intact today.  Also in the Competitive Impact Statement relating to

the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express*

*Co.*, No. 10-cv-4496-NGG-RER, Dkt. #5 (E.D.N.Y. Oct. 4, 2010), at 6, the U.S. Department of

Justice Antitrust Division alleged that Visa and MasterCard possessed market power in the

"network services market" for "General Purpose Cards" (i.e. general purpose credit and charge

cards).  The non-discrimination restraints at issue in that case prevented merchants from

"reducing [their] purchases of one network's services by encouraging [their] customers to choose

a competing network's General Purpose Card."  *Id.* at 7.  Although a merchant could

theoretically resist high acceptance fees by no longer accepting Visa's or MasterCard's Credit

Cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively

constrain Defendants' market power because merchants cannot refuse to accept these General

Purpose Cards without alienating customers and losing significant sales."  *Id.*

101.    These determinations that Visa and MasterCard possessed substantial market

power are supported by direct evidence of that power, including:  (1) Visa's and MasterCard's

ability to raise Interchange Fees without the loss of merchant acceptance or transaction volume;

(2) successful price discrimination, such as the price discrimination described above; (3) setting

Interchange Fees unrelated to costs; (4) the ability to enforce anticompetitive policies; and (5)

forcing merchants and consumers to accept inferior products, including products that are

susceptible to fraud.

### a.    Ability to raise Interchange Fees with impunity

#### i.    Visa

102.    Starting in the 1970s, Visa has possessed and exercised substantial market power

in the Credit Card Network Services market and that market power has increased significantly

since then.  By the 1990s, Visa Credit Cards became the primary or only such cards for tens of

millions of consumers in the United States.  Accepting Visa Credit Cards became a competitive

necessity for the vast majority of merchants, especially for card-not-present merchants that were

heavily reliant on accepting such cards remotely.

103.    In the Credit Card Network Services market, Visa raised Credit Card Interchange

Fees without merchants ceasing to accept Visa's Credit Cards.  In fact, Visa typically gained

volume after these increases.  For example, during the Damages Period, Visa permitted Issuers to

reclassify standard Visa Credit Cards as Premium Credit Cards and the Interchange Fees that

merchants paid for transactions made with such cards increased.  Notwithstanding merchant

opposition to these punitive price increases, no merchant dropped Visa as a result.  Once a

merchant begins to accept Visa Credit Cards, it is virtually impossible for it to stop.

104.    Visa continued to possess by far the highest market shares and the highest number

of Credit Cards in circulation throughout the Damages Period.  Accordingly, most merchants

must accept Visa Credit Cards to remain viable.

105.    At the beginning of the Damages Period, Visa raised its Signature Debit Card

Interchange Fees, and then throughout the Damages Period, Visa exercised its substantial market

power to increase PIN Debit Card Interchange Fees.  Even with these price increases, Visa's

debit volumes increased during the Damages Period.  As with Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit Cards despite these significant price increases.  Visa's ability to increase Interchange Fees without losing merchant acceptance or transaction volume directly evidences its market power in the Debit Card market.

106.    Visa's (and MasterCard's) substantial market power in the Debit Card market and the supracompetitive nature of Debit Card Interchange Fees were confirmed by the passage by Congress of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"), which required the Board of Governors of the Federal Reserve System (the "Federal Reserve") to enact regulations to ensure that Debit Card Interchange Fees for covered Issuers (i.e., banks with more than $10 billion in assets) are "reasonable and proportional" to Issuer costs.  Section 920(a)(2) of the EFTA, 15 U.S.C. § 1693o-2(a)(2).  In passing the Durbin Amendment, Congress made clear that the statute was designed to address Visa's and MasterCard's ability to exercise substantial market power by raising Interchange Fees well above cost.  Its principal author, Richard J. Durbin, made numerous statements to that effect on the floor of the Senate, including:

> For years, Visa and MasterCard, and their big bank backers, have unilaterally fixed prices on the fees small businesses pay every time they accept a debit card from a customer.  The two giant card networks control 80 percent of the debit card market – that is Visa and MasterCard.  And it is no surprise that the debit interchange fees have risen, even as the price of processing the transaction has fallen… .  Finally, Visa, MasterCard, and the Wall Street banks will face some check against their unbridled market power in the credit and debit industries.

156 Cong. Rec. S5, 802-03 (daily ed. July 14, 2010).  Even though the Federal Reserve found that most Issuers' costs were slightly above "par," to implement the Durbin Amendment, it capped both Signature and PIN Debit Interchange Fees at $0.21 plus .05% plus an additional $0.01 fraud-prevention adjustment.  *See Regulation II, Debit Card Interchange Fees and*

*Routing, Final Rule,* 76 Fed. Reg. 43,394 (July 20, 2011)(setting the cap); *Regulation II, Debit Card Interchange Fees and Routing, Final Rule,* 77 Fed. Reg. 46,258 (Aug. 3, 2012)(adding the fraud-prevention adjustment).  This cap substantially reduced the debit Interchange Fees that prevailed for years due to Visa's and MasterCard's market dominance, but was still significantly above cost for most Issuers and the Interchange Fees were higher than they would be if there was active competition for merchant acceptance.  In fact, on July 31, 2013, Judge Richard Leon held in *NACS, et al. v. Board of Governors*; Civil Case No. 11-02075 (D. D.C. July 31, 2013) that the Federal Reserve Board's regulation did not comply with the intent of the Durbin Amendment and, essentially, that the rates set by the regulation were still excessive.  Accordingly, even after the imposition of maximum Interchange Fees levels pursuant to the Durbin Act, American Eagle continued to suffer damages by being forced to pay supracompetitive Interchange fees on Visa and MasterCard Debit Card transactions.

107.    Notably, despite this significant reduction in Debit Card Interchange Fees, few, if any, merchants chose to stop accepting Visa or MasterCard Credit Cards and Visa and MasterCard did not reduce their Credit Card Interchange Fees.  This further demonstrates Visa's and MasterCard's substantial market power.

ii.    *MasterCard*

108.    Like Visa, MasterCard also has possessed and exercised substantial market power in the Credit Card Network Services market since the 1970s, and MasterCard's market power also has increased significantly over the years.  By the 1990s, MasterCard Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting MasterCard Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

109.    Like Visa, MasterCard has continually raised Credit and Debit Card Interchange Fees without losing merchant acceptance.  Like Visa, MasterCard permitted Issuers to reclassify standard MasterCard Credit Cards as Premium Credit Cards dramatically increasing Interchange Fees paid for transactions.  Notwithstanding merchant opposition to these punitive price increases, no merchant dropped MasterCard as a result.  Once a merchant begins to accept MasterCard Credit Cards, it is virtually impossible for it to stop.

110.    Also like Visa's, and as described in paragraph 93 above, MasterCard's substantial market power in the Debit Card market and the supracompetitive nature of Debit Card Interchange Fees were confirmed by the passage by Congress of the Durbin Amendment and subsequent regulatory and judicial findings.

111.    MasterCard's substantial market power was further evidenced by its ability to successfully charge merchants even higher Interchange Fees than Visa, even though MasterCard had lower market shares.  Throughout the Damages Period, MasterCard fixed Interchange Fees that were higher than Visa's.  MasterCard designed this strategy to compensate for its self-perceived inferiority to Visa in other dimensions that could make MasterCard less attractive to Issuers absent the higher Interchange Fees.  If it did not have substantial individual market power over merchants, MasterCard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

    b.    Price discrimination

112.    As one court held, "Visa's and MasterCard's ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . . Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar'

merchants.  [Visa and MasterCard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet Merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions."  *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-31.  This price discrimination occurred through the Damages Period and continues today.

### c.      Setting supracompetitive prices unrelated to cost

113.    Visa and MasterCard did not set Interchange Fees based upon cost, as they would have done in a competitive market.  For example, with respect to the Debit Card market, as noted above, the Federal Reserve found in 2011 that Visa's and MasterCard's Signature Debit and PIN Debit Card rates were substantially above cost.  Visa's and MasterCard's ability to succeed in this conduct and profit from it is additional direct evidence of their substantial market power.

### d.      Enforcement of anticompetitive rules and policies

114.    Visa's and MasterCard's successful enforcement of anticompetitive rules and policies that harmed merchants without losing merchant acceptance or transaction volume further demonstrates the substantial market power that Visa and MasterCard had in the Payment Card markets.  Despite the adverse economic impact of these rules and policies on merchants, given Visa's and MasterCard's substantial market power, merchants could not afford to stop accepting Visa or MasterCard transactions.

### e.      Forcing merchants and consumers to accept inferior products

115.    Visa's and MasterCard's success in forcing merchants and consumers to accept and use technologically-inferior products, including products that Visa and MasterCard knew would increase fraud, is further evidence of their substantial market power.  Visa and MasterCard could have dramatically reduced Payment Card fraud in the United States during the Damages Period simply by adopting new card technology to replace the decades-old, fraud-

36

prone magnetic stripe technology they forced merchants and consumers to use.  Instead, Visa and

MasterCard succeeded in shifting most of the cost of fraud losses to merchants in this country

through the implementation of various compliance programs and liability rules, including the

chargebacks, fees, and fines.  They did so because they and their Member Banks profit from

fraud which creates a pretextual justification for high Interchange Fees.  Visa and MasterCard

also profited from fraud through punitive fines and fees for data breaches, another manifestation

of their substantial market power.

116.    Visa and MasterCard have long recognized that the magnetic stripe technology

that their Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud

prone.  Yet Visa and MasterCard have perpetuated the use of magnetic stripe technology by,

among other things, delaying the implementation of more secure technologies.  As a result, the

United States has experienced the highest fraud rates, with the gap growing.

117.    This is a direct result of the conspiracies and unlawful conduct detailed in this

Complaint.  Despite the availability of technology to reduce fraud, Visa and MasterCard had no

incentive to adopt it in the United States or compete on this basis because they could shift fraud-

related costs to merchants and thereby profit from fraud while insulating the banks from its costs.

Visa's and MasterCard's ability to impose inferior quality card products and to permit

preventable fraud during the Damages Period is further direct evidence of their substantial

market power.

118.    To the extent that American Eagle was forced to absorb the costs of such fraud

through chargebacks or fees or fines, such costs are damages caused by the conspiracies

complained of herein.

119.    Visa's and MasterCard's substantial market power continued, and even increased,

during the Damages Period.  In fact, despite its substantial size and status in the retail market, American Eagle cannot drop Visa or MasterCard Credit or Debit Cards without losing an unacceptable number of sales.

> **6.    The MasterCard and Visa IPOs were changes in corporate form that maintained and enhanced the cartels.**

120.    During the Damages Period, the Member Banks that sat on the Visa and MasterCard boards and controlled them approved MasterCard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs. These Member Banks took advantage of their direct control over pre-IPO Visa and MasterCard to agree to post-IPO structures for Visa and MasterCard that were designed to perpetuate, and to not disturb, the anticompetitive conduct detailed in this Complaint.

121.    These IPOs were a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and MasterCard's organizational structures as associations of competing Member Banks.  *See, e.g.*, MasterCard Incorporated Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73 (noting that MasterCard had "faced heightened regulatory scrutiny and legal challenges in recent years.").

122.    In response to these legal and antitrust challenges, Defendants and the Member Banks that sat on their boards decided to change the organizational structures of Visa and MasterCard in order to attempt to evade antitrust liability through superficial changes in corporate form.  However, in undertaking these actions, the Member Banks of Visa and MasterCard agreed prior to the IPOs that post-IPO Visa and MasterCard would continue to support the agreements not to compete and to fix prices.

123.    They implemented this agreement by structuring the IPOs so that they cosmetically changed the corporate forms, but kept the anticompetitive conduct intact.

124.     Pre-IPO, the these Member Banks conspired through Visa's and MasterCard's governing boards and/or their ownership of Visa and MasterCard to control every aspect of Visa's and MasterCard's businesses, including agreeing to fix Interchange Fees through ratification of the default Interchange Fee schedules and agreeing to set Visa's and MasterCard's rules, including maintaining the Honor All Issuers rules.

125.     Post-IPO, Visa and MasterCard act as the pricing and rules enforcement agents of their Member Banks.  Through the corporate restructuring and subsequent IPOs, all Visa and MasterCard Member Banks effectively delegated to Visa and MasterCard in perpetuity the ability to fix the banks' pricing to merchants.  Each knew that all other Visa and MasterCard Member Banks were also delegating their pricing decisions to Visa and MasterCard, which arrangement was ratified by a horizontal agreement of Visa's and MasterCard's Member Banks when they voted to approve Visa's and MasterCard's restructurings on these bases.

126.     Moreover, as part of the corporate reorganizations leading to the IPOs, the Member Banks reaffirmed and effectively readopted each Network's rules, including the default Interchange Fee and Honor All Issuer rules.  Thus, each Member Bank's approval of this scheme was done knowing that all other Visa and MasterCard Member Banks' Interchange Fees would be set by Visa and MasterCard.

127.     As described above, this was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  The end result was the same as before the IPOs:  Visa and MasterCard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance.

128.     The IPOs increased the effectiveness of the price fixing conspiracies as well as

Visa's and MasterCard's substantial market power by consolidating decision-making and coordinating communications among conspirators.

129.    The anticompetitive effects of these ongoing conspiracies continue to harm merchants and consumers.  The Member Banks continue to adhere to the rules at issue, without exception, and Visa and MasterCard continue to wield substantial market power over merchants as a result.  In this regard, Visa and MasterCard and their Member Banks understood before the IPOs were consummated that if Visa and MasterCard maintained the cartels' basic rules and structures, no bank would break rank and compete for merchant acceptance.  That is precisely what happened.

130.    The Defendants' post-IPO conduct confirms that the IPOs did not terminate the price fixing cartels or reduce Visa's and MasterCard's substantial market power.  Visa's and MasterCard's anticompetitive rules, including the restraints at issue in this Complaint, have remained the same.  Visa and MasterCard have exercised their substantial market power by imposing new network fees that merchants must pay.  Visa has engaged in a campaign to maintain its substantial market and monopoly power in the General Purpose Debit Card market.  Perhaps most significantly, Visa's and MasterCard's Interchange Fees have remained at supracompetitive levels since the IPOs.  This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

131.    Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct.  In 2007, the European Commission's Competition Directorate issued a written determination that MasterCard's members had simply agreed to appoint MasterCard as their cartel manager to act in their collective best interest in setting Interchange Fees.  The Competition Directorate's comprehensive decision found as follows:

> MasterCard's viewpoint that the IPO . . . had changed the organisation's governance so fundamentally that any decision of MasterCard Incorporated's Global Board no longer qualifies as [a] decision of an association [of its Member Banks] but rather as [a] "unilateral" act which each Member Bank bilaterally agrees to abide by, cannot be accepted. . . . MasterCard's Member Banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The Member Banks effectively "outsourced" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . after MasterCard's management assured them that the banks' interests will continue to be preserved under a new "enhanced customer approach" and via the local input of the banks in the decision making.  It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the Member Banks legitimately expected and therefore agreed that this Board would henceforth set the MIF in a manner that is in their common interest.

European Commission Decision, COMP/34.579, at ¶¶ 357, 378-379 (Dec. 19, 2007) (footnotes omitted).

132.     The fact that a majority of MasterCard's post-IPO directors were "independent" did not change the role of MasterCard as the "outsourced" pricing agent and manager of the members' Interchange Fee cartel:

> The circumstances that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings.  As an organisation's members entrust decision making power to a common body with the expectations that the body's subsequent coordination of their competitive behaviour will occur in the common interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.

Id. at ¶ 381.  Moreover, "[d]evelopments after the IPO also indicate that MasterCard's management takes into account concrete banks['] interests in setting the level of fallback interchange fees."  Id. at ¶ 389.

133.    In May 2012, the European General Court affirmed the Commission's

conclusions:

> [T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by MasterCard's IPO, the MasterCard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks.   Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the MasterCard payment organization in determining the MIF.

*MasterCard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 259 (May 24, 2012).

"[W]ith regard to merchants, what [MasterCard and its Member Banks] sought [post-IPO was]

essentially the maximum threshold of their tolerance to the price of card transactions."

*Id.* at ¶ 257.

### 7.    Defendants' price fixing schemes also are unlawful vertical price restraints.

134.    The Interchange Fee price fixing schemes adopted by Defendants also constituted

anticompetitive and unreasonable vertical price restraints.  Visa and MasterCard entered into

express vertical agreements with each of their Member Banks, binding all of their Member

Banks to comply with the rules and regulations of their networks, including the rules at issue in

this Complaint.  In turn, Visa and MasterCard each acts as the enforcement agent and holds

issuing and acquiring members responsible for compliance with the rules.  These two sets of

vertical price restraints, one for Visa and its Member Banks and the other for MasterCard and its

Member Banks, continued in full effect during the Damages Period, including after Visa's and

MasterCard's IPOs.

135.    For example, Rule 1.3 of the July 15, 2011 MasterCard Rules states:  "[a]n

applicant to be a Member must agree, and by execution and submission of an application to be a

Member agrees, that it will comply with all applicable provisions of the Certificate of

Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as:  "[t]he

Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the

operating regulations and procedures of the Corporation, including but not limited to any

manuals, guides or bulletins, as may be amended from time to time." *See Definitions,*

*MasterCard Rules* (July 15, 2011).  Similarly, the "General Overview" of the April 10, 2011

Visa International Operating Regulations states:  "[t]he Visa International Operating Regulations

are set and modified by Visa to support the use and innovation of Visa products and services, and

represent a binding contract between Visa and all Members."

> **E.      Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without
>           Justification.**

136.    Although Defendants have argued in the past that Interchange Fees are cost-based

and necessary mechanisms to reimburse Issuers to motivate them to issue Credit or Debit Cards,

the facts show otherwise.

137.    Payment Card systems have functioned successfully without Interchange Fees in

the United States and internationally.  Payment Card Networks can thrive without interchange.

138.    Moreover, the Interchange Fees set by Defendants are not based on cost.

139.    There is no procompetitive justification for Interchange Fees to offset

anticompetitive harm caused by anticompetitive conduct detailed in this Complaint.

> **1.      Banks would profit from issuing Debit Cards even without collectively-set
>           Interchange Fees.**

140.    Debit Cards have long been positioned by Visa and MasterCard and their Member

Banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero

interchange) for decades.  As such, Issuers have strong economic incentives to issue Debit Cards

even without income from Interchange Fees.  Debit Cards provide numerous economic benefits

to Issuers that justify their issuance even without Interchange Fees.  These benefits include:

(1) savings relative to the costs of processing checks and cash; (2) motivating cardholders to

43

maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuers to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of Debit Cards enhances and deepens an Issuer's valuable relationship with its customers.

141.    When banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they paid merchants to provide debit services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided debit services "at-par."  The market for Debit Card Network Services expanded substantially during the time of Issuer-paid and at-par interchange.  This model prevailed until the early 1990s, when it changed only because Visa and MasterCard extended their cartels into debit.

142.    Beginning in the early 1990s, Visa and MasterCard aggressively began to implement and enforce a strategy to leverage their substantial market power in the Credit Card market and force merchants to pay supracompetitive Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants that accepted Visa's and MasterCard's dominant Credit Cards to also accept the networks' Signature Debit Card transactions.  Visa and MasterCard set the same or similar Interchange Fees for Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions.  Merchants had no choice but to accept Visa's and MasterCard's dominant, supracompetitively-priced Credit Card products and, therefore, were forced to accept supracompetitive Signature Debit Card Interchange Fees.

143.    Visa and MasterCard then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy and thereby entrench their dominance in the Debit Card market.  This strategy successfully destroyed the at-par model

that had prevailed for debit prior to the 1990s as Visa and MasterCard had intended.  Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and MasterCard and to suppress the safer, cheaper and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as NYCE and STAR.

144.   The substantial non-interchange economic benefits of issuing Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment.  Addressing that impending regulatory cap, the CEO of Citigroup said: "We don't have much of an impact on debit card interchange or overdraft fees.  Those are really small impacts on us."  Citigroup Inc. Q4 2010 Earnings Call Transcript (Jan. 18, 2011).  The Chairman and CEO of City National Corporation predicted:  "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material."  City National Corporation Q4 2010 Earnings Call Transcript (Jan. 20, 2011).  TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on Debit Card Interchange Fees.  Transcript to TCF Financial Corp.'s Conference Call, TCF Discusses Lawsuit Challenging Durbin Amendment (Oct. 12, 2010).

145.   The facts that Debit Card issuance continues to be profitable and Debit Card volumes have increased since Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011 reinforce the conclusion that Debit Card Interchange Fees had been fixed at supracompetitive levels throughout the Damages Period.

146.   The experience in other industrialized countries also highlights that the development of debit in the United States was a function of anticompetitive conduct in the Debit

Card industry in this country.  Virtually all countries with the highest debit usage, including

Canada, Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway, utilize an at-

par interchange pricing model.  For example, the Canadian debit system has always been based

on at-par pricing, and Canada has traditionally had higher per capita debit usage than the United

States, as well as higher debit penetration in merchant categories that do not accept PIN Debit

Cards in the United States.

147.    The vast and successful U.S. checking system also demonstrates that Interchange

Fees are not necessary for a Debit Card Network to function.  Since 1916, by rule of the Federal

Reserve, trillions of dollars of checks drawn on the U.S. national banking system have cleared at

par.  Despite this prohibition on Interchange Fees, banks have continued to offer checks to their

customers and have continued to accept and cash checks issued by other banks.

**2.      Banks would profit from issuing Credit Cards even without collectively set Interchange Fees.**

148.    In the 1980s, the default Interchange Fee rules were rationalized as being

necessary to give Credit Card Issuers incentives to issue such cards.  By 1990, it was apparent

that Credit Card Issuers were earning substantial profits from interest rates on revolving balances

and annual fees, and therefore Interchange Fees were unnecessary to encourage issuance.  Since

then, the evidence has continued to show that Credit Card Issuers can be profitable without

collectively-set Interchange Fees.

149.    International experience regarding Interchange Fees on Credit Card transactions

also indicates that Interchange Fees in the United States have been fixed at supracompetitive

levels.  In Australia, the Reserve Bank of Australia regulated Visa's and MasterCard's Credit

Card Interchange Fees during the past decade.  Those regulations mandated a nearly 50%

reduction (to an average of 50 basis points) of those Interchange Fees, rates that are much lower

than those that prevailed in the United States during the Damages Period.  Prior to enactment of these regulations, Visa and MasterCard argued that such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry.  In reality, no such collapse occurred.  Visa's and MasterCard's Credit Card volumes have <u>increased</u> in Australia since the regulations went into effect.  Indeed, the European General Court recently reviewed the evidence from Australia and concluded "[i]t is clear . . . that a substantial reduction in the MasterCard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability."  *MasterCard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 111 (May 24, 2012).

150.    Similarly, the European Commission undertook a comprehensive study of Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by MasterCard's and Visa's European affiliates.  In 2002, the Commission and Visa reached a settlement that lowered Interchange Fees first to 0.7%, and then to a cost-based standard if lower.  This commitment expired in 2007, and the Commission began a new investigation, which continues.  Following Visa's 2002 commitment to limit consumer Credit Card Interchange Fees to 0.7%, Visa announced in May 2013 that it will limit Interchange Fees to 0.3%.  In 2007, the Commission found MasterCard's setting of Interchange Fees to be unlawful, and MasterCard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision.  For years, therefore, the resulting European Interchange Fees have been substantially below those in the United States that often exceed 2.00% due to the proliferation of Premium Credit Cards.  Again, there have been no adverse effects and Visa's and MasterCard's Credit Card volumes in Europe have increased during this period.

151.    In neither Australia nor the European Union do Visa and MasterCard enjoy the economies of scale and scope associated with the much larger Payment Card markets in the United States.  Visa's and MasterCard's Credit Card Interchange Fees in the United States are higher than nearly every other Credit Card Network outside the United States, including Visa's and MasterCard's own Networks in other countries.

152.    The costs associated with issuing Visa and MasterCard Credit Cards have declined dramatically since 1990.  Issuer costs of funding a cardholder's grace period, known as "float costs," have fallen significantly.  Visa and MasterCard Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

153.    Notwithstanding these declines in Issuer costs, however, Visa and MasterCard have substantially raised their Interchange Fees.  For example, Visa has raised the Interchange Fees and/or costs of acceptance applicable to Visa Credit Card transactions throughout the Damages Period.  MasterCard has done the same.  This demonstrates that Interchange Fees are not based on costs, but rather are a cartel's anticompetitive exercise of market power.

154.    Visa and MasterCard have argued that default Interchange Fees are justified because, as a result of their Honor All Issuers rules, an individual Issuer could otherwise potentially "hold up" merchants that accept Visa's and MasterCard's Payment Cards by charging as high an Interchange Fee as that Issuer wishes.

155.    This "hold-up" problem is the result of the banks' anticompetitive agreements not to compete for merchant acceptance, *i.e.*, the Honor All Issuers rules.  Attempting to justify

Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is self-serving, self-fulfilling and perverse.  An agreement not to compete is not a justification for anticompetitive conduct.  It is itself anticompetitive conduct.

156.    Moreover, these schemes create an enormous amount of anticompetitive harm. Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive problem created by the schemes themselves) was credited as a procompetitive benefit, which it should not be, any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Complaint.

> **3.    Anti-steering rules hid the costs of Visa and MasterCard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and MasterCard cartels.**

157.    In a competitive world, some merchants could have used financial incentives and marketing to steer customers to other Networks or forms of payment and, by increasing customers' price sensitivity to Interchange Fees, steering could have led to network competition. Visa and MasterCard prevented this from happening by enforcing anti-steering rules that prohibited merchants from making the cost of Visa and MasterCard transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

158.    During the Damages Period, the anti-steering rules included Visa's and MasterCard's rules that prohibited merchants from offering discounts to consumers that used Payment Cards that were less expensive than Visa or MasterCard Payment Cards.  These rules remained in effect until Visa and MasterCard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the Antitrust Division.

159.    Visa and MasterCard, however, still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa or

MasterCard Payment Cards instead of more expensive Visa or MasterCard Payment Cards issued by other banks. Such discounting by Visa or MasterCard Issuer would force Visa and MasterCard Member Banks to compete for merchant acceptance.

160.    The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on Credit Cards. Because of the way the Debit Card industry developed, with most cards originating as ATM/PIN Debit Cards, Debit Cards have long had multiple network linkages or "bugs" on them, and that has facilitated the most effective form of steering for merchants, namely, routing transactions to cheaper Payment Card Networks. There is no technical reason why multiple network functionality could not co-reside on Credit Cards. Visa and MasterCard rules, however, blocked that from happening throughout the Damages Period.

161.    The anti-steering restraints also include the rules that prevent merchants that accept Visa and MasterCard from testing differential acceptance or new ways to steer transactions to cheaper Payment Card Networks at certain locations that operate under a single banner. That is the way many merchants pilot new products, and such testing would have enabled merchants to introduce new ways to force the banks to compete for merchant acceptance.

162.    The anti-steering rules also included Visa's and MasterCard's prohibitions against surcharging their transactions. Visa's previous no-surcharge rule (*see, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations, Volume 1 – General Rules* (Nov. 15, 2008)) provided that "[a] Merchant must not…[a]dd any surcharge to [t]ransactions." MasterCard's previous no-surcharge rule (*see, e.g.,* Rule 5.9.2, *Mastercard Rule* (Oct. 2008)) similarly provided that "[a] Merchant must not directly or indirectly require any [MasterCard] Cardholder to pay a surcharge

or any part of any Merchant discount." While Visa and MasterCard modified these rules under the proposed settlement in MDL 1720 to permit surcharging of Visa and MasterCard Credit Card transactions in limited circumstances effective January 27, 2013, the no surcharging rules remain in place for Visa and MasterCard Debit Card transactions.

163.    There were and are no procompetitive justifications for these anti-steering rules. If merchants had not been restrained by these rules, some could have played Visa and MasterCard or the Member Banks against one another by steering or threatening to steer customers away from using more expensive Visa and MasterCard Payment Cards. Were it not for the restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or MasterCard or from Issuers. As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

**F.    Antitrust Injury**

164.    Defendants' and their Member Banks' price fixing cartels and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of Payment Card Network Services in the form of inflated Interchange Fees paid directly by those merchants, including American Eagle, foreclosure of network competitors, and reduced output. Merchants and their customers have borne and continue to bear the brunt of hundreds of billions of dollars of supracompetitive fees and severely decreased consumer welfare.

165.    American Eagle has suffered direct antitrust injury from Defendants' conduct in violation of the antitrust laws set out above. During the Damages Period, American Eagle had contracts with Acquirers under which it directly paid the applicable Interchange Fee to the relevant Issuer with respect to transactions in which American Eagle accepted a Defendant's Payment Card as a method of payment. As a result, American Eagle paid (and continues to pay)

substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Complaint.  American Eagle was (and continues to be) deprived of the benefits of competition limited by this conduct in the relevant markets.

166.    Because the supracompetitive Interchange Fees that American Eagle and other merchants had to pay were a substantial cost of doing business, American Eagle and other merchants were forced to raise retail prices charged to their customers, to reduce retail services provided to their customers as a means of offsetting these Interchange Fees, and/or to reduce research, development and innovation.  As a result, retail sales were below what they would have been and innovation, research, and development were limited.  Consequently, the economy was harmed.

167.    Moreover, as evidenced by the impact on merchant acceptance of the mandated Interchange Fee reductions in Australia, inflated Interchange Fees also artificially reduce merchant acceptance of Payment Cards.  These reductions in retail sales and merchant acceptance, coupled with the limitations on competition from other Networks resulting from Defendants' anticompetitive conduct, significantly reduced output below what it would have been.  By imposing a massive and hidden tax on both merchants and consumers, Defendants' conduct decreased consumer welfare and imposed substantial anticompetitive harm.

168.    Further, because of the conduct detailed in this Complaint, American Eagle could not limit these higher retail prices to customers using the Payment Cards that generated the underlying Interchange Fees.  All customers, including less affluent ones who are more likely to pay with cash, had to bear the cost of these inflated Interchange Fees in the form of higher retail prices.

169.    Further, the imposition of supracompetitive Interchange Fees distorted Issuer

incentives in both markets, perpetuating the fraud-prone magnetic stripe system in the United States.  This diminution of innovation is further harm to competition.

## COUNT I

### Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Credit Card Network Services

170.    American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

171.    Visa's and its Member Banks' agreement not to compete and price fixing schemes constituted anticompetitive horizontal restraints.

172.    Visa and its Member Banks have maintained the conspiracy for Visa Credit Card transactions throughout the Damages Period.

173.    This conspiracy anticompetitively increased and maintained the Interchange Fees that merchants paid to Issuers for Visa Credit Card transactions, and imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/Member Banks that the banks will not compete for merchants' acceptance of Visa transactions.

174.    The price fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

175.    American Eagle suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

176.     As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

### COUNT II

### Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Debit Card Network Services

177.     American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

178.     Visa's and its Member Banks' agreement not to compete and price fixing schemes constituted anticompetitive horizontal restraints.

179.     Visa and its Member Banks maintained the conspiracy for Visa Debit Card transactions throughout the Damages Period.

180.     This conspiracy anticompetitively increased and maintained the Interchange Fees that merchants paid to Issuers for Visa Debit Card transactions, and imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/Member Banks that the banks will not compete for merchants' acceptance of Visa transactions.

181.     The price fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

182.     American Eagle suffered antitrust injury from these *per se* unlawful and/or

unreasonable restraints of trade.

183.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

## COUNT III

### Against MasterCard for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Credit Card Network Services

184.    American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

185.    MasterCard's and its Member Banks' agreement not to compete and price fixing schemes constituted anticompetitive horizontal restraints.

186.    MasterCard and its Member Banks have maintained the conspiracy for MasterCard Credit Card transactions throughout the Damages Period.

187.    This conspiracy anticompetitively increased and maintained the Interchange Fees that merchants paid to Issuers on MasterCard Credit Card transactions, and  imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/Member Banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

188.    The price fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

189.     American Eagle suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

190.     As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

## COUNT IV

### Against MasterCard for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for Debit Card Network Services

191.     American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

192.     MasterCard's and its Member Banks' agreement not to compete and price fixing schemes constituted anticompetitive horizontal restraints.

193.     MasterCard and its Member Banks maintained the conspiracy for MasterCard Debit Card transactions throughout the Damages Period.

194.     This conspiracy anticompetitively increased and maintained the Interchange Fees that merchants paid to Issuers for MasterCard Debit Card transactions, and imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/Member Banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

195.     The price fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose and achieved no legitimate

efficiency benefit to offset its substantial anticompetitive effects.

196.     American Eagle suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

197.     As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

## COUNT V

### Against Visa for Vertical Price Restraints in the Market for Credit Card Network Services

198.     American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

199.     Visa's and its Member Banks' price fixing schemes constituted unreasonable and anticompetitive vertical restraints.

200.     Visa entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuers and Acquirers in its Network responsible for compliance with these rules and regulations.  These agreements continued throughout the Damages Period.

201.     These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Visa Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose and achieved no legitimate efficiency benefit

to offset its substantial anticompetitive effects.

202.    American Eagle suffered antitrust injury from these unreasonable restraints of trade.

203.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

## COUNT VI

### Against Visa for Vertical Price Restraints in the Market for Debit Card Network Services

204.    American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

205.    Visa's and its Member Banks' price fixing schemes constituted unreasonable and anticompetitive vertical restraints.

206.    Visa entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuers and Acquirers in its Network responsible for compliance with these rules and regulations.  These agreements continued throughout the Damages Period.

207.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Visa Debit Card transactions and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose and achieved no legitimate efficiency benefit

to offset its substantial anticompetitive effects.

208.    American Eagle suffered antitrust injury from these unreasonable restraints of trade.

209.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

## COUNT VII

### Against MasterCard for Vertical Price Restraints in the Market for Credit Card Network Services

210.    American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

211.    MasterCard's and its Member Banks' price fixing schemes constituted unreasonable and anticompetitive vertical restraints.

212.    MasterCard entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held Issuers and Acquirers in its Network responsible for compliance with these rules and regulations.  These agreements continued throughout the Damages Period.

213.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for MasterCard Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose and achieved no legitimate

efficiency benefit to offset its substantial anticompetitive effects.

214.    American Eagle suffered antitrust injury from these unreasonable restraints of trade.

215.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision.

<u>**COUNT VIII**</u>

**Against MasterCard for Vertical Price Restraints in
the Market for Debit Card Network Services**

216.    American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 169 with the same force and effect as if set forth here in full.

217.    MasterCard's and its Member Banks' price fixing schemes constituted unreasonable and anticompetitive vertical restraints.

218.    MasterCard entered into an express vertical agreement with each of its owner/Member Banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held Issuers and Acquirers in its Network responsible for compliance with these rules and regulations.  These agreements continued throughout the Damages Period.

219.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for MasterCard Debit Card transactions and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose and achieved no legitimate

efficiency benefit to offset its substantial anticompetitive effects.

220.    American Eagle suffered antitrust injury from these unreasonable restraints of trade.

221.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, American Eagle was injured in its business and property in an amount not presently known with precision but which exceeds $100 million prior to trebling.

## COUNT IX

### Against All Defendants for Violation of State
### Antitrust and Unfair Competition Laws

222.    American Eagle repeats and re-alleges each and every allegation contained in paragraphs 1 through 221 with the same force and effect as if set forth here in full.

223.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

224.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alaska Stat. § 45.50.562 et seq.

225.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

226.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

227.    By reason of the foregoing, Defendants and their Member Banks entered into

agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 28-4501 et seq.

228.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 542.15 et seq. and Florida Stat. Ann. § 501.201 et seq.

229.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 et seq.

230.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Idaho Code § 48-101 et seq.

231.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

232.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Indiana Code 24-1-2 et seq.

233.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

234.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et seq.

235.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kentucky Stat. Ann. §365.020 et seq. and § 367.175 et seq.

236.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Louisiana Revised Statutes § 51:121, et seq.

237.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. 10, § 1101 et seq.

238.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maryland Commercial Law Code Ann. § 11-201 et seq.

239.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of the Massachusetts Antitrust Act, 93 Mass. Gen. Laws § 1 et seq.

240.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

241.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

242.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of

Mississippi Code Ann. § 75-21-1 et seq.

243.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of the Missouri Antitrust Law, § 416.011 et seq.

244.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of the Montana Rev. Code Ann. §30-14-201 et seq.

245.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

246.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

247.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Hampshire Rev. Stat. Ann. §356.1 et seq.

248.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

249.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

250.    By reason of the foregoing, Defendants and their Member Banks entered into

agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

251.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 et seq.

252.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Ohio Rev. Code. § 1331.01 et seq.

253.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 79 Oklahoma Stat. § 201 et seq.

254.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

255.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 10 Laws of Puerto Rico Ann. § 257 et seq.

256.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

257.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1 et seq.

258.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

259.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Texas Bus. & Com. Code Ann. § 15.01 et seq.

260.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Utah Code Ann. §76-10-911 et seq.

261.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

262.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of the Virginia Antirust Act, Va. Code §59.1-9.1 et seq.

263.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of the Washington Rev. Code 19.86.010 et seq.

264.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of West Virginia Antitrust Act, 47-18-1 et seq.

265.    By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of

Wisconsin Stat. Ann. § 133.01 et seq.

266.     By reason of the foregoing, Defendants and their Member Banks entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wyoming Stat. §40-4-101 et seq.

267.     As a direct and proximate result of Defendants' unlawful conduct, American Eagle suffered injury to its business and property in each of these states and Puerto Rico by paying artificially-inflated, supracompetitive Interchange Fees for Credit Card Network Services and Debit Card Network Services.

## PRAYER FOR RELIEF

Wherefore, American Eagle Outfitters, Inc. prays for relief and judgment as follows:

A.      Judgment in its favor and against each Defendant in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      An award of the costs of suit, including reasonable attorneys' fees; and

C.      Such other and further relief as this Court may deem just, equitable and proper and/or as otherwise permitted by law.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues properly triable thereby.


**GORDON & REES LLP**

By: */s/ Richard T. Victoria*
S. Manoj Jegasothy
Pa. Id.#80084
*mjegasothy@gordonrees.com*
Richard T. Victoria
Pa. Id. #76681
*rvictoria@gordonrees.com*

707 Grant Street, Suite 3800
Pittsburgh, PA  15219
(412) 577-7400
Fax:  (412) 347-5461

*Counsel for Plaintiff American Eagle Outfitters, Inc.*

1088787/16784763v.1